**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| VINCENTE GONZALES,  :  | CIVIL CASE NO. |
|     Plaintiff, : | 3:13-CV-1565 (JCH) |
| : | |
| v. : | |
| : | |
| EAGLE LEASING COMPANY, : | SEPTEMBER 25, 2014 |
|     Defendant. : | |

**RULING RE: DEFENDANT'S MOTION TO DISMISS (DOC. NO. 33)**

**I.   INTRODUCTION**

On April 21, 2014, Vincente Gonzales filed an Amended Complaint (Doc. No. 26) against his former employer, Eagle Leasing Company ("Eagle").[1] In the Amended Complaint, Gonzales alleges: (1) violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil rights Act of 1991; (2) negligent supervision; and (3) intentional infliction of emotional distress. In response, Eagle filed a Motion to Dismiss (Doc. No. 33), arguing that Gonzales's Amended Complaint should be dismissed in its entirety because it fails to state a claim upon which relief may be granted.

For the following reasons, Eagle's Motion to Dismiss is granted as to the claim of negligent supervision and is otherwise denied.

---

[1] Gonzales filed the original Complaint (Doc. No. 1) on October 25, 2013, and on January 20, 2014, Eagle filed a Motion to Dismiss (Doc. No. 15). Eagle's original Motion to Dismiss applies to the initial Complaint, and Eagle repeats any arguments applicable to the Amended Complaint in the instant Motion. Eagle's original Motion to Dismiss is therefore terminated as moot.

1

## II.     FACTUAL BACKGROUND

The Amended Complaint alleges the following facts.  Gonzales is a Hispanic male residing in New Haven, Connecticut.  Am. Compl. ¶ 4.  He is Cuban, and Spanish is his first language.  Id.  From December 14, 1999 through September 20, 2011, Gonzales worked for Eagle as a laborer.  Id. ¶¶ 6, 36.  Eagle is a business operating in Orange, Connecticut.  Id. ¶ 5.  The President and Director of Eagle is Louis Eagle; he is a white, non-Hispanic male.  Id. ¶ 7.  Gonzales satisfactorily performed his job throughout the course of his employment at Eagle.  Id.

During Gonzales's employment, Eagle hired roughly 40 laborers, approximately 92 percent of which were Hispanic.  See id. ¶ 11.  Hispanic and non-Hispanic laborers at Eagle share the same or similar employment title, position, duties, supervisors, work hours, and tasks at the workplace.  Id. ¶ 12.  However, Eagle treats Hispanic laborers differently from non-Hispanic laborers in a number of ways, including: showing hostility towards Hispanic workers; demanding that they not speak Spanish; directing ethnically-based derogatory terms towards them; and laying off or terminating them more frequently and sooner than non-Hispanics.  Id. ¶¶ 15, 16, 18.  Eagle also routinely subjected Hispanic laborers to a dangerous and unsafe working environment, and threatened them with termination if they complained.  Id. ¶ 19.  These unsafe conditions included welding, trailer repair, and maintenance work atop storage containers with substandard safety equipment, and working in freezing or wet conditions.  Id. ¶¶ 20–21.  Hispanic workers received safety gear only when there was to be an inspection.  Id. ¶ 40.  Eagle disregarded Hispanic laborers' complaints and medical limitations, telling them that there was no light duty work and that they could go home.  Id. ¶¶ 22–26.

Eagle and its supervisors berated Hispanic employees, saying that they were "stupid," and that they were "terrible" or "shitty" workers. Id. ¶ 31. When Gonzales or other Hispanic workers spoke Spanish, the supervisor told them that they were "talking shit," and he would often say, "We are in America, speak English!" Id. ¶¶ 32, 38. When Hispanic workers complained about discriminatory treatment, they were sent to the office to be disciplined or threatened with termination. Id. ¶¶ 42, 45. One supervisor would often became angry, and when he did so, he would engage in violent and intimidating behavior like throwing bottles to the ground or against the wall. See id. ¶ 45.

On September 19, 2011, Gonzales's supervisor asked Gonzales to do a job that required him to wear glasses. Id. ¶ 27. When Gonzales informed the supervisor that he did not have his glasses, the supervisor angrily ordered Gonzales to go home. Id. The supervisor then told Gonzales's coworker, who had been interpreting between Gonzales's Spanish and the supervisor's English, that he did not want blind people working at Eagle. Id. ¶ 28. However, the supervisor also told the interpreting coworker that Gonzales still had a job and that he should bring his glasses in the future. Id. ¶ 29. Despite this, Eagle terminated Gonzales on September 20, 2011. Id. ¶ 36.

After being terminated, Gonzales filed complaints with the United States Equal Employment Opportunity Commission and the Connecticut Commission on Human Rights and Opportunities, and he received a Notice of Right to Sue and a Release of Jurisdiction, respectively. Id. ¶ 50.

### III.     STANDARD OF REVIEW

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief'" (alteration in original)).  The court takes the factual allegations of the complaint to be true, Hemi Grp., LLC v. City of New York, 559 U.S. 1, 4 (2010), and draws all reasonable inferences in plaintiff's favor, Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009).  However, the tenet that a court must accept a complaint's allegations as true is inapplicable to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (2009) (quoting Twombly, 550 U.S. at 556).

The plausibility standard does not impose an across-the-board, heightened fact pleading standard.  Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008).  It does not

4

"require[ ] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8." Arista Records, LLC v. Doe 3, 604 F.3d 110, 119 (2d Cir. 2010); see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (holding that dismissal was inconsistent with the "liberal pleading standards set forth by Rule 8(a)(2)"). However, the plausibility standard does impose some burden to make factual allegations supporting a claim for relief. As the Iqbal Court explained, it "does not require detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (citations and internal quotations omitted). According to the Second Circuit, the plausibility standard is "flexible," obliging the plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Boykin, 521 F.3d at 213 (citations omitted); accord Arista Records, 604 F.3d at 120.

**IV.   DISCUSSION**

  A.  Count One: Violation of Title VII

Gonzales alleges that Eagle violated Title VII by: (1) engaging in disparate treatment based on race and national origin discrimination;[2] (2) creating a hostile work

---

[2] Gonzales alleges that Eagle's Title VII violations were based on his "race, ethnicity, heritage, [and] national origin." Am. Compl. ¶¶ 48, 49. The court addresses these types of discrimination together because Gonzales pleads the same facts for all of his Title VII claims. Gonzales also appears to claim that the Title VII violations were based on age discrimination. Am. Compl. ¶ 49. The court does not address this theory, because Gonzales pleads absolutely no facts related to it.

environment based on race and national origin discrimination; and (3) retaliating against him for his complaints. See Am. Compl. ¶¶ 48, 49.³ Eagle argues that Gonzales fails to state a claim because the Amended Complaint does not contain sufficient facially plausible, non-conclusory allegations.

In Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002), the Supreme Court held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . to survive [a] motion to dismiss." Id. at 515. Instead, the complaint must include "enough facts to state a claim for relief that is plausible on its face." Patane v. Clark, 508 F.3d 106, 111–12 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 570). "In order to satisfy the facial plausibility standard in the employment discrimination context, a combination of Iqbal and Swierkiewicz, a complaint must allege 'the essential elements of an employment discrimination claim—that [the] plaintiff suffered discrimination on the basis of protected status.'" Shlafer v. Wackenhut Corp., 837 F. Supp. 2d 20, 25 (D. Conn. 2011) (quoting Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011)). "[W]hile a complaint need not contain specific facts establishing a prima facie case of employment discrimination to overcome a Rule 12(b)(6) motion, the claim must be facially plausible, and must give fair notice to the defendants of the basis for the claim." Fowler v. Scores Holding Co., Inc., 677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009); see also Brown v. Daikin America, Inc., 756 F.3d 219, 228–29 & n.10 (2d Cir. 2014) ("Courts in our Circuit have reconciled Swierkiewicz, Twombly, and Iqbal by concluding that, to survive a motion to dismiss, a

---

³ This Motion to Dismiss addresses only the Title VII theories discussed by the parties. To the extent that Gonzales alleges other Title VII theories, he should move to file a new Amended Complaint to clarify them.

Title VII plaintiff's complaint must be facially plausible and allege sufficient facts to give the defendant fair notice of the basis for the claim; it need not, however, make out a prima facie case.").

While Swierkiewicz does not require Title VII plaintiffs to plead facts establishing a prima facie case of employment discrimination, Gonzales does plead such facts for his disparate treatment, hostile work environment, and retaliation claims.  Thus, Gonzales satisfies his pleading requirement.

       1.     Disparate Treatment

To establish a prima facie case of disparate treatment under McDonnel Douglas, 11 U.S. 792 (1973), the plaintiff bears the initial burden of showing " that: (1) he is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).[4]  In order to create an inference of discrimination through evidence of disparate treatment, the plaintiff must show that the individuals with whom he compares himself are "similarly situated in all material respects." Id. at 39.  While Title VII does not protect against discrimination on the basis of language alone, a language-restriction policy may reflect intent to

---

[4] Gonzales argues that he has alleged "sufficient instances of direct evidence of discrimination" so that he does not need to "plead each element of a prima facie case." Mem. Opp'n Defs.' Mot. Dismiss 10. "Where there is direct evidence that race was the motivating factor, 'the McDonnell Douglas search for a motive is unnecessary and therefore inapplicable.'" Patrolmen's Benev. Ass'n of City of New York, Inc. v. City of New York, 74 F. Supp. 2d 321, 333 (S.D.N.Y. 1999) (quoting Johnson v. New York, 49 F.3d 75, 79 (2d Cir. 1995)).  However, Gonzales has not presented direct evidence that race was a motivating factor.  In any event, the only disputed element here is whether the circumstances gave rise to an inference of discrimination.

7

discriminate on the basis of classifications that are protected.  See Pacheco v. New York Presbyterian Hosp., 593 F. Supp. 2d 599, 612–13 (S.D.N.Y. 2009); Brewster v. City of Poughkeepsie, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006).

Here, Gonzales satisfies the first and third elements: he is Hispanic and he was terminated.  Am. Compl. ¶¶ 4, 36.  Gonzales's allegation that he was employed as a laborer for over 10 years creates a reasonable inference that he was qualified for his position, so he satisfies the third element as well.  Id. ¶ 6.

Regarding the last element of the prima facie case – an inference of discrimination based on disparate treatment – Gonzales alleges a number of ways in which he and Eagle's other Hispanic workers were treated differently from similarly situated non-Hispanic workers.  Many of Gonzales's allegations border on conclusory.  See, e.g., id. ¶¶ 8, 9, 14, 19–26, 28, 30–35, 46, 48.  Moreover, while Gonzales alleges a list of ways in which Hispanic workers were treated poorly, he does not allege how similarly situated non-Hispanic workers were treated in contrast, other than with the occasional allegation that non-Hispanic workers were not subjected to the poor treatment.  See id. ¶ 15.

On the other hand, Gonzales alleges various instances of Eagle's supervisors using rude or derogatory language when demanding that Hispanic workers speak English.  See, e.g., id. ¶¶ 32 (alleging that a supervisor referred to speaking Spanish as "talking shit"), 38 ("[The supervisor] would say 'We are in America, speak English!'").  Gonzales also alleges that Eagle's supervisors used "ethnicity based" derogatory terms directed at Hispanic workers.  Id. ¶ 15.  Further, while Gonzales fails to explicitly allege that non-Hispanic workers were treated differently, he does allege that similarly-

situated, non-Hispanic workers existed, see id. ¶ 11, and he refers to Eagle's treatment of specifically Hispanic workers throughout the Amended Complaint. See generally id. Construing the allegations in the light most favorable to Gonzales, it is reasonable to infer that Hispanic workers were treated differently from their non-Hispanic counterparts where Gonzales specifically referred to Hispanic workers being treated a certain way. Similarly, it is reasonable to infer that the non-Hispanic, similarly-situated workers were not subjected to the verbally abusive methods of enforcing the English-only policy. Thus, Gonzales has alleged sufficient facts to state a Title VII disparate treatment claim, and Eagle's Motion to Dismiss that claim is therefore denied.

    2.  Hostile Work Environment

 "A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). Conduct is sufficiently severe only if it "so severely permeated [the workplace] with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Id. However, the workplace need not be unendurable or intolerable. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000). The misconduct must create an objectively hostile environment, and the plaintiff must subjectively perceive the workplace as such. Alfano, 294 F.3d at 374.

 Gonzales has alleged sufficient facts to support a hostile work environment claim. Specifically, he has alleged that Eagle's supervisors verbally insulted him and

the other Hispanic laborers by calling them or their work quality "stupid," "terrible," and "shitty." Am. Compl. ¶ 31. Gonzales also alleged that, on one occasion, a supervisor called an employee a "bastard" after the employee interpreted between Gonzales's Spanish and the supervisor's English. Id. ¶ 30. As discussed above, Gonzales further claims that Eagle's supervisors not only enforced the English-only policy, but did so in offensive ways. See id. ¶ 32. The Amended Complaint contains allegations suggesting that supervisors placed Gonzales and other employees in physically compromising positions. For example, one supervisor allegedly threw bottles against walls and on the floor. Id. ¶ 44. Gonzales and others were required to engage in dangerous tasks without the appropriate safety equipment, such as welding atop safety containers. See id. ¶ 21. Gonzales also alleged that he was not allowed to drink water from a drinking fountain, but instead from a dirty hose. See id. ¶ 35. While this is may not be outright unsafe, it is certainly demeaning, and it supports Gonzales's theory of a hostile work environment.

While many, if not all, of the alleged instances would not likely survive a motion to dismiss in isolation, taken together, the allegations plausibly state a hostile work environment claim under Title VII. Therefore, Eagle's Motion to Dismiss that claim is denied.

### 3. Retaliation

To state a prima facie case of retaliation under Title VII, the plaintiff must allege that: (1) he engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. See Kessler v.

Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006).  Proof of the causation element "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

Gonzales has met the first, second, and third elements: he allegedly complained to Eagle about discriminatory treatment[5] and he was terminated.  See Am. Compl. ¶¶ 19, 26, 36, 37, 42.  Regarding the fourth element, the Amended Complaint contains many references to retaliatory conduct.  See id. ¶¶ 8, 19, 26, 37, 42, 45, 47, 48, 49.  Despite the bareness of some of these references, Gonzales allegations are sufficient to survive a motion to dismiss.  One allegation states that Eagle "routinely ignored, threatened with termination, punished or terminated" Hispanic workers who complained about their supervisor's harassing and belittling conduct toward Hispanics and Spanish-speakers.  Id. ¶ 26.  Another states that "[t]he plaintiff was harassed, discriminated against and terminated due to his Hispanic heritage and his complaints about unlawful conduct."  Id. ¶ 47.  Yet another alleges that Eagle's "conduct was . . . in retaliation for [Gonzales's] complaints."  Id. ¶ 48; see also id. ¶¶ 8, 49, 45 ("Employees of Hispanic heritage who complained about discriminatory treatment were threatened with

---

[5] Gonzales also allegedly complained about unsafe work conditions.  See Am. Compl. ¶ 19.  However, complaining to an employer about workplace safety does not appear to be protected activity under Title VII.  See Harp v. Hunter College, 162 F.3d 1147, No. 97-7461, 1998 WL 639397 (Table), at *2 (2d Cir. 1998).

11

termination.")  These allegations, taken as true, give rise to an inference of retaliatory animus.  Gonzales also alleges that Eagle's harassing, discriminatory, and retaliatory conduct continued throughout the course of his employment.  See id. ¶¶ 8, 48, 49.  Thus, construing the allegations in the light most favorable to Gonzales, he has alleged that Eagle's retaliatory conduct, i.e., its termination of Gonzales, were close in time to at least some of his protected complaints.

Eagle stresses that Gonzales's allegations on the fourth element of retaliation are bare.  See Def.'s Mem. Supp. 17.  However, assuming Swierkiewicz remains the law, Gonzales is not required to plead facts supporting a prima facie case of a Title VII violation.  534 U.S at 515.  Under Swierkiewicz's lowered pleading standard, Gonzales's allegations must be plausible and give fair notice to Eagle.  See Brown, 756 F.3d at 228–29 & n.10.  His allegations satisfy that standard.  Even assuming that Swierkiewicz is no longer good law after Iqbal, Gonzales's retaliation claim would still survive a motion to dismiss because he has plausibly alleged sufficient facts to state a claim.  Therefore, Eagle's Motion to Dismiss Gonzales's retaliation claim under Title VII is denied.

B. Count Two: Negligent Supervision

Gonzales next alleges that Eagle had a duty to oversee its supervisors to ensure that they did not "discriminate against or harass" its employees, and that Eagle breached that duty.  Am. Compl. ¶¶ 50–55.  Eagle argues that Gonzales has failed to state a negligent supervision claim because: he has not plead sufficient facts; the alleged conduct occurred during Gonzales's continuing employment; and he has not suffered the type of harm such a claim addresses.

To state a negligent supervision claim, a plaintiff must allege "that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise." Abate v. Circuit-Wise, Inc., 130 F. Supp. 2d 341, 344 (D. Conn. 2001).  However, "an employee cannot bring a [negligence] claim against her employer for employee conduct resulting in emotional distress occurring during an ongoing employment relationship, as distinguished from conduct occurring in the termination of employment or a claim of negligent supervision or retention asserted by a non-employee third-party." Marino v. EGS Elec. Grp., LLC, 3:12-CV-518 (JBA), 2014 WL 1289453, at *12 (D. Conn. Mar. 31, 2014) (citing Perodeau v. City of Hartford, 259 Conn. 729, 757 (2002)); see also Antonopoulos v. Zitnay, 360 F. Supp. 2d 420, 431 (D. Conn. 2005) ("Perodeau now seems to clarify that . . . Connecticut bars all negligence-based emotional distress claims occurring within a continuing employment context."). Further, a plaintiff must allege an injury in tort to state a claim of negligent supervision; unlawful discrimination alone is insufficient to state such a claim. See Millspaugh v. Connecticut Water Serv., Inc., 3:07-CV-871 (CFD), 2008 WL 906842, at *4 (D. Conn. Mar. 31, 2008); Deguzman v. Kramer, 3:04-CV-2064 (JCH), 2005 WL 2030447, at *2 (D. Conn. Aug. 23, 2005).

Here, Gonzales's allegations mostly relate to conduct that occurred during his employment at Eagle.  The only allegations that specifically relate to his termination involve the incident in which Gonzales was unable to perform a task because he forgot his glasses. See Am. Compl. ¶¶ 27–30. Gonzales does not allege any facts during the process of his termination that would state a negligence claim resulting in emotional distress.  Therefore, to the extent Gonzales alleges that Eagle's negligent supervision

13

claim resulted in emotional harm, he is barred from recovery by Perodeau.

Moreover, Gonzales argues that Eagle has a "duty not to discriminate against him" and that is "exactly the claim which the plaintiff has . . . alleged." Pl.'s Mem. Opp'n (Doc. No. 47-1) at 37. Thus, Gonzales only alleges injuries arising out of Title VII violations, such as discrimination by his supervisors, so he has not alleged an injury sufficient to state a negligent supervision claim. Deguzman, 2005 WL 2030447, at *2.

Finally, Gonzales alleges that he "has suffered severe financial harm, physical harm and jeopardy, emotional harm, anxiety, upset [sic], fear, indignity, stress, deprivation of rights, loss of employment, loss of pay, loss of benefits and severe emotional distress" as a result of Eagle's alleged failure to adequately supervise its employees. Am. Compl. ¶ 55. To the extent that this statement alleges physical harms, i.e., harms that go beyond those redressed by Title VII and an emotional distress claim, his allegation is entirely conclusory. Gonzales does not mention what physical harm he has suffered, nor does he allege how Eagle's failure to supervise its employees caused him physical harm.

Therefore, Eagle's Motion to Dismiss Count Two is granted.

C. Count Three: Intentional Infliction of Emotional Distress

Finally, Gonzales alleges that Eagle's conduct constituted intentional infliction of emotional distress ("IIED"). Eagle argues that its alleged conduct was not extreme and outrageous. To state a claim of intentional infliction of emotional distress, the plaintiff must allege:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the

14

>   defendant's conduct was the cause of the plaintiff's distress[;] and (4) that
>   the emotional distress sustained by the plaintiff was severe.

Petyan v. Ellis, 200 Conn. 243, 253 (1986).  Conduct is extreme and outrageous only if it "exceeds all bounds usually tolerated by decent society."  Appleton v. Bd. of Educ. of Stonington, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id. at 211.

"In assessing whether [a] [p]laintiff's factual allegations set forth a claim for intentional infliction of emotional distress, the [c]ourt must consider the totality of the circumstances rather than each individual allegation in isolation." Pottie v. Atl. Packaging Grp., LLC, 3:12-CV-773 (WIG), 2012 WL 6087282, at *3 (D. Conn. Dec. 6, 2012); see also Edwards v. New Opportunities Inc., 305-CV-1238 (JCH), 2007 WL 947996, at *8 (D. Conn. Mar. 26, 2007) (taking into account the plaintiff's incorporated allegations of hostile work environment, constructive discharge, and retaliation claims, and denying the defendant's motion to dismiss an IIED claim).  "'Where reasonable [minds] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'" Talit v. Peterson, 44 Conn. Supp. 490, 498 (Super. Ct. 1995) (quoting 1 Restatement (Second) of Torts § 46 cmt. h).  For that reason, several Connecticut courts addressing IIED claims in the employment context have "denied defendant employers' motions to strike based on the plaintiffs' allegations that the plaintiffs' supervisors made the comments concerning the plaintiffs' race or ethnicity, and did so numerous times, so as, possibly, to constitute a pattern of conduct."

15

Gonzalez v. Harte Subaru, Inc., CV106011240S, 2010 WL 4722262, at *6 (Conn. Super. Ct. Nov. 2, 2010) (citing cases); see also Burr v. Howell, CV020464225S, 2003 WL 21675848, at *4 (Conn. Super. Ct. June 25, 2003) (noting that an isolated incident of a racial slurs is insufficient to sustain an IIED claim, but implying that repeated use of such language may).

"In order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business." A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 208 (1990).

Here, Gonzales's allegations relate to the conduct of his supervisors. Much of the supervisors' conduct was within the scope of their employment and in furtherance of Eagle's business. For instance, the supervisors allegedly enforced an English-only policy in an offensive way by telling Spanish-speaking employees that they were "talking shit." Am. Compl. ¶ 35. Supervisors for Hispanic laborers to drink out of a dirty hose instead of a water fountain in order to save time. Id. ¶ 35. Apparently in an effort to make Hispanic laborers work harder, supervisors would repeatedly berate them for being "stupid" or insult the quality of their work, calling it "terrible" or "shitty." Id. ¶ 31. Supervisors would also use "ethnicity based derogatory terms." Id. ¶ 15. The supervisors' conduct was continuous and persistent throughout the course of Gonzales's employment. See id. ¶¶ 9, 48–49.

Viewing the Complaint in its entirety, the supervisors' conduct, which was committed in the scope of their employment at Eagle and in furtherance of Eagle's business, could – at this stage of the case – reasonably be deemed extreme and

outrageous. Thus, the court denies Eagle's Motion to Dismiss Count Three of the Amended Complaint.

## V. CONCLUSION

For the foregoing reasons, the court **DENIES** in part and **GRANTS** in part Eagle's Motion to Dismiss (Doc. No. 33). The court grants Eagle's Motion to Dismiss Count Two. The court denies Eagle's Motion to Dismiss on Counts One and Three.

Unless Gonzales moves to file a new Amended Complaint to clarify the claims he is making under Title VII, the court will assume that he is only asserting the Title VII claims addressed in this Ruling – retaliation, hostile work environment, and disparate treatment. If Gonzales chooses to move to file an Amended Complaint, the court instructs him to enumerate his Title VII claims in separate counts and to do so no later than October 7, 2014.

The court **TERMINATES** Eagle's original Motion to Dismiss (Doc. No. 15) as moot.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 25th day of September, 2014.

        /s/ Janet C. Hall
        Janet C. Hall
        United States District Judge