UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VINCENTE GONZALES,<br>    Plaintiff, | :<br>:<br>: | CIVIL CASE NO.<br>3:13-CV-1565 (JCH) |
| v. | :<br>: | |
| EAGLE LEASING COMPANY,<br>    Defendant. | :<br>:<br>: | AUGUST 14, 2015 |

**RULING RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. No. 63)**

**I.   INTRODUCTION**

Plaintiff Vincente Gonzales brought this lawsuit against defendant Eagle Leasing Company ("Eagle"), his former employer, after Eagle terminated his employment. In the Amended Complaint, Gonzales alleged that Eagle (1) violated Title VII of the Civil Rights Act of 1964, (2) negligently supervised him, and (3) intentionally inflicted him with emotional distress. Only the first and third of these claims survived Eagle's Motion to Dismiss (Doc. No. 33). See Ruling Re: Defendant's Motion to Dismiss (Doc. No. 54). Eagle now moves for summary judgment on these remaining claims. See Defendant's Motion for Summary Judgment (Doc. No. 63).

For the following reasons, the court denies in part and grants in part Eagle's Motion.

1

## II.     FACTS

The record before the court reveals a number of factual disputes.  The court notes such disputes that are material to its decision.[1]

Eagle sells and leases truck trailers and ground-level containers.  Plaintiff's Local Rule 56(a)2 Statement (Doc. No. 71-2) ("Pl.'s L.R. 56(a)2 Statement") ¶ 1.[2]  Foreman Manuel Fernandes hired Gonzales as a laborer in December 2009.  Id. ¶ 3.  Gonzales worked at Eagle's Orange, Connecticut, jobsite as a laborer until his termination in September 2011.  Id.

Gonzales complains of a number of workplace conditions that Eagle subjected him to over the course of his employment.  The nature and significance of these conditions are a matter of dispute.  Among other things, Gonzales testified that he endured dangerous working conditions, such as cleaning ice or snow off of an icy roof or painting in dangerous positions.  See Gonzales Dep. I (Doc. No. 71-3) at 108–12.  The parties dispute whether Eagle provided sufficient safety training and equipment to engage in these tasks.  See Pl.'s L.R. 56(a)2 Statement ¶¶ 30–36.  Gonzales also stated that he was told to drink water out of a hose, which was closer to his work station, instead of a water fountain so as not to waste time.  See Gonzales Dep. I at 133.

---

[1] To the extent Gonzales denies facts, but cites no admissible evidence to support such denial, the court deems these assertions admitted unless it found such evidence in its own review of the record. See Johnson v. Connecticut Dep't of Admin. Servs., 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("Where the Plaintiff has objected to Defendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials, or where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted."), aff'd, 588 F. App'x 71 (2d Cir. 2015).

[2] The court generally cites to Gonzales's Local Rule 56(a)2 Statement to show Eagle's underlying Rule 56(a)1 Statement (Doc. No. 64) and Gonzales's response to that statement.

Aside from safety concerns and other general workplace complaints, Gonzales also complains about certain behaviors of Foreman Fernandes.  Gonzales testified that Fernandes would throw employees' food away, although Gonzales admits he did not know why Fernandes did this.  See Gonzales Dep. II (Doc. No. 71-4) at 30–31.  Indeed, Gonzales believes he was terminated because he refused to follow Fernandes's order to throw coworkers' lunches away.  See id.; Gonzales Dep. I at 15.  Another former employee, Felix Molina, testified that Fernandes would frequently make disparaging comments about Hispanic food, saying things like, "I don't know how you can eat that food" or "look at this shit food."  Molina Dep. (Doc. No. 71-5) at 14.  Molina also referred to Fernandes throwing away employees' lunches.  Id.  Molina further testified that Fernandes would make comments such as, "fuck you, Cuban," "you have no brain," or you are "good for nothing."  Id. at 61.  Molina stated that, when Fernandes was unhappy with his work, he would throw a water bottle on the floor and say things like, "look at the fucking Cuban, . . . the shit that he's doing."  Id. at 14; see also id. at 50.

The central incident in the case revolves around Gonzales's termination.  The parties agree that, on September 19, 2011, Gonzales and Alberto Enrique Fresneda, another laborer, were asked to repair a trailer.  Pl.'s L.R. 56(a)2 Statement ¶ 56.  This repair required Gonzales and Fresnada to cut plywood with a power saw.  Id.

Beyond that, the parties dispute what occurred.  Eagle maintains the following: Fernandes and Matthews showed Gonzales how to properly cut the plywood, but Gonzales ultimately cut the wood crookedly.  Def.'s L.R. 56(a)1 Statement ¶¶ 57–58.  Fernandes told Gonzales that he had cut the wood incorrectly, and Gonzales and Fresnada then explained to Fernandes that they both had poor vision.  Id. ¶ 60.

Fernandes told the two workers to obtain prescription glasses. Id. ¶ 61. Fresnada did just that and returned to work at Eagle. Id. ¶ 62. Gonzales, on the other hand, confronted Ferndades in front of other laborers, and he threatened to go to a lawyer. Id. ¶¶ 63, 65. Fernandes told Gonzales he could find other work if he was unhappy. Id. ¶ 66. Later that day, Gonzales returned to Eagle's office to discuss this incident, and he brought his stepdaughter, Kateria Pedras. Id. ¶ 67. Pedras and Gonzales met with Louis Eagle, the owner of Eagle Leasing Company, Foreman Fernandes, and Reinaldo Rodriguez, another foreman, in Louis Eagle's office. See id. ¶ 69. Fernandes suggested that Gonzales speak in Spanish and Pedras translate his words into English. Id. ¶ 70. Pedras then told Fernandes to "shut up," and she had a confrontation with Louis Eagle in which she talked over him and accused him of being prejudiced. Id. ¶¶ 71–72. After Louis Eagle asked Pedras and Gonzales to leave the premises, Pedras yelled negative comments about Louis Eagle and Eagle's employees. Id. ¶¶ 73–74. Louis Eagle, Fernandes, and Rodriguez unanimously agreed that Gonzales should be terminated because of the disturbances he and Pedras had created. Id. ¶ 75. Gonzales returned the following morning, and Rodriguez told him that he was terminated for the disturbances he and Pedras had caused. Id. ¶¶ 77–78.

     Citing to sporadic (and often irrelevant) pages of his deposition testimony, Gonzales denies this account. See Pl.'s L.R. 56(a)2 Statement ¶¶ 55–75. While Gonzales's submissions are less helpful than they might be in assisting the court to understand the record, the court understands his position to be the following: Fresnada and Gonzales were replacing a piece of plywood in a trailer and, in order to do so, they had to cut a new piece of plywood. See Gonzales Dep. I at 136–37. Gonzales's work

was consistent with what Fernandes had approved on prior occasions, but this time Fernandes told him he incorrectly replaced the plywood and fired him on the spot. Id. at 137, 140, 151–52. Fernandes never told Gonzales to go get prescription glasses, but Eagle ordered glasses for Fresnada. Id. at 142, 148, 151. Gonzales summoned Pedras to the premises and waited for her outside of Louis Eagle's office. Id. After Pedras arrived, Gonzales and Pedras met with Louis Eagle, Fernandes, and Rodriguez in Louis Eagle's office. See id. at 149. In the meeting, Pedras asked why they fired Gonzales. Id. at 150, 152. Louis Eagle asked Pedras where she was from, to which she responded that she was born in the United States. Id. at 150. Louis Eagle then called her a bastard and told her to "go back home." Id. However, he also apparently told Gonzales to come back with prescription glasses.[3] Id. Gonzales came back the next day with the appropriate glasses, and Rodriguez told him that Louis Eagle did not want him to work there. Gonzales Dep. II at 29–30.

## III. STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once

---

[3] The court includes Gonzales's version of Pedras's exchange with Louis Eagle for the sake of background. However, Gonzales has submitted no admissible evidence to support this version. Gonzales was present for the conversation, but he does not speak or understand English. See Gonzales Dep. I at 152–53. Rather, he testified that Pedras told him what had been said, id. at 29–30, 153, so the testimony is inadmissible hearsay. While an interpreter typically does not present a hearsay problem because he or she is no more than a "language conduit," where there is a reason to believe that a translation is inaccurate or the interpreter has a motivation to mislead, there is such a hearsay problem. See United States v. Da Silva, 725 F.2d 828, 831–32 (2d Cir. 1983). More importantly, here, Pedras was not acting as a mere language conduit: Gonzales was not speaking during the meeting.

5

the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**IV.   DISCUSSION**

Gonzales asserts that Eagle violated Title VII by disparately treating him because he is Hispanic, creating a hostile work environment for him, and retaliating against him for complaining about discrimination. Gonzales further claims that Eagle intentionally inflicted emotional distress on him. The court discusses these claims in turn.

    A.   Disparate Treatment

To establish a disparate treatment claim under Title VII, a plaintiff must show that he was treated less favorably than others simply because of his race, color, religion, sex, or national origin. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). To make this showing, a plaintiff must prove that the employer had a

discriminatory motive, which can be established by circumstantial or direct evidence. See, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983). Where a plaintiff can show an employer's discriminatory motive with direct evidence, the burden shifts to the employer to prove that it would have made the same decision without taking into account the plaintiff's race, color, religion, sex, or national origin. See Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1568 (2d Cir. 1989) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (plurality opinion)).

However, where direct evidence is unavailable – a common scenario – and the plaintiff seeks to show the employer's discriminatory motive with circumstantial evidence, the discrimination claim must survive a three-part burden-shifting test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at 802, 805; McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006). Under this test:

> [The] plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson, 457 F.3d at 215 (internal quotation marks omitted).

Gonzales baldly asserts that he "has indisputably offered direct evidence that [his] Hispanic heritage was the motivating factor for [Eagle's] conduct." Plaintiff's Memorandum in Opposition (Doc. No. 71-1) ("Pl.'s Mem. Opp'n") at 32. He cites no evidence in the record to support this contention, and the court finds none. Thus, the court engages in the McDonnell Douglas burden-shifting test.

7

To establish a prima facie case of unlawful discrimination under Title VII, Gonzales must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). "A plaintiff's burden to establish a prima facie case of discrimination is not onerous. Direct evidence is not necessary." Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995) (internal citations and quotation marks omitted). The parties appear to dispute the second and fourth elements but, because the court rules that no reasonable jury could find that Gonzales has satisfied the fourth, it does not address the second.

Gonzales has failed to come forward with evidence giving rise to an inference that he suffered an adverse employment action on account of his race, ethnicity, or national origin. Based on the record before the court, Gonzales only presented evidence of one adverse action: his termination. Gonzales has presented no evidence that he was terminated because of his race, ethnicity, or national origin. While he did offer testimony that Fernandes sometimes cursed at employees or required workers to complete undesirable tasks, he admitted that Fernandes treated all employees the same. See Gonzales Dep. I at 99–100. Indeed, Gonzales did not testify at all that he was terminated based on his race, ethnicity, or national origin: to the contrary, he believes he was fired because he refused to throw away his co-workers' food. See id. at 137; Gonzales Dep. II at 15.

While the court ultimately concludes that a reasonable jury could find that Fernandes engaged in conduct that created a hostile work environment for Gonzales on

the basis of his race, ethnicity, or national origin, see Part IV.B., infra, there is no evidence that connects such hostile treatment to his termination.  Therefore, no reasonable jury could find that Gonzales suffered an adverse employment action, i.e., his termination, based on his race, ethnicity, or national origin.

B.   Hostile Work Environment

"A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted).  The parties do not dispute the second element.

Regarding the first element, conduct is sufficiently severe only if it "so severely permeated [the workplace] with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Id.  However, the workplace need not be unendurable or intolerable. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000).  The misconduct must create an objectively hostile environment, and the plaintiff must subjectively perceive the workplace as such. Alfano, 294 F.3d at 374.  Importantly, a plaintiff must establish "that she was subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes." Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).

Based on the evidence before the court, a reasonable jury could find that Eagle subjected Gonzales to a hostile work environment based on his race, ethnicity, or national origin. Gonzales and Molina both testified that Fernandes cursed at the workers, almost all of whom were Hispanic. See Gonzales Dep. I at 123; Molina Dep. 61. Molina testified that Fernandes referred to ethnicity while cursing, recalling Fernandes making comments like, "fuck you, Cuban." Molina Dep. 61. Molina also stated that Fernandes become violent when he was unhappy, throwing a water bottle on the floor and saying things like, "look at the fucking Cuban, . . . the shit that he's doing." Id. at 14; see also id. at 50–51. Further, Molina, testified that Fernandes made comments about traditionally Cuban food, saying things like, "I don't know how you can eat that food," or "look at this shit food." Id. at 14. Coupled with Gonzales's and Molina's testimony that Ferndandes threw employees' lunches into the garbage, see id.; Gonzales Dep. I at 30–31, a reasonable jury could infer that Fernandes was subjecting Gonzales to a hostile work environment.[4]

C.   Retaliation

Retaliation claims are also analyzed under the burden-shifting framework: the plaintiff must establish a prima facie case; if it does so, the burden shifts to the defendant to assert a legitimate, non-retaliatory reason for the challenged employment decision; and, if the defendant can do that, the plaintiff must point to sufficient evidence

---

[4] Disposing of the workers' food is especially hostile in light of Gonzales's and Molina's testimony that they would sometimes have to work much later than expected. See id. at 37, 92, 123; Molina Dep. 19. This gives rise to an inference that Fernandes caused some employees to work long hours with little or no food.

to allow a reasonable factfinder to find that the defendant's asserted reason is merely a pretext. See, e.g., Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

### 1.     Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the protected activity and the adverse employment action. See id. Eagle contends that Gonzales has failed to satisfy the first and fourth of these elements.

#### i. Protected Activity

A protected activity is either opposition to a discriminatory employment practice prohibited by, or participation in any proceeding under, Title VII. See 42 U.S.C. § 2000e-3(a). "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Treglia, 313 F.3d at 719. Title VII does not prohibit unsafe or dangerous working conditions, so complaints about such conditions are not a "protected activity" under the statute. See, e.g., Rodriguez v. Beechmont Bus Serv., Inc., 173 F. Supp. 2d 139, 150 (S.D.N.Y. 2001) (cooperating with OSHA investigation is not a protected activity under Title VII).

To the extent that Gonzales argues that he made complaints about workplace safety or general employment condition, such complaints are not a protected activity under Title VII. See id. However, aside from these complaints, Gonzales asserts that he engaged in a protected activity on two occasions: complaining to Louis Eagle with

his stepdaughter and refusing to throw other employees' lunches away. With respect to the first of these, the record contains evidence that Gonzales, through Pedras, accused Louis Eagle of being prejudiced and racist. See Def.'s L.R. Statement ¶¶ 71–74.[5] Complaining about racial discrimination is certainly a protected activity. See, e.g., Rivera v. Thurston Foods, Inc., 933 F. Supp. 2d 330, 342 (D. Conn. 2013).

A reasonable jury could also find that Gonzales's refusal to throw employees' lunches away constitutes a protected activity. Through Molina's testimony, Gonzales provided evidence that gives rise to an inference that Fernandes threw Hispanic worker's lunches away because he disliked or disapproved of Hispanic culture. See Molina Dep. 14. Indeed, the court has determined that a reasonable jury could find that Fernandes's conduct in this regard contributed to a hostile work environment. See Section IV.B., supra. Therefore, a reasonable jury could find that Gonzales's refusal to throw employees' food away was a protected activity.

### ii. Causal Connection

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted). Here, Gonzales testified that Eagle terminated him on the same day that he refused to dispose of employees' food. See Gonzales Dep. I at 137 ("[T]hat was the day he told me to throw away the food . . . ."). A reasonable jury could certainly infer

---

[5] Gonzales has introduced no admissible evidence as to what was said in the meeting with Louis Eagle: although Gonzales was present in the meeting, he does not speak or understand English, and his account of what occurred in the meeting is based on what his stepdaughter told him. See Gonzales Dep. I at 30, 153. His stepdaughter has provided no testimony in this case, and nothing in the record indicates that she will be available to testify at trial. Therefore, Gonzales's testimony regarding this incident is inadmissible hearsay. However, Eagle produced evidence that the Gonzales complained of discrimination through Pedras. See Def.'s L.R. Statement ¶¶ 71–74.

a causal connection between that Gonzales's refusal to dispose of the food and his termination based on this temporal proximity. Likewise, Eagle claims that it terminated Gonzales the day after the incident with Pedras when Gonzales arrived at the worksite, Def.'s L.R. 56(a)1 Statement ¶ 77, and a reasonable jury could infer a causal connection between Gonzales and Pedras' accusations of discrimination and Gonzales's termination based on the close temporal proximity.

        2.     Eagle's Proffered Reason for Termination

Eagle asserts that it terminated Gonzales because of Gonzales's poor performance and the disturbance Gonzales created with his stepdaughter. See Def.'s Mem. Supp. 22 ("The record shows that the plaintiff was terminated because he did not satisfactorily perform his job."); Def.'s Reply 8 ("The defendant has always proffered the same non-discriminatory bases for its termination of the plaintiff; namely, his workplace disturbances of September 19, 2011."). Poor performance can be a legitimate reason to terminate an employee. See, e.g. Chukwurah v. Stop & Shop Supermarket Co. LLC, 354 F. App'x 492, 495 (2d Cir. 2009). And courts generally hold disruptive behavior to be a legitimate reason for an employer to terminate an employee. See, e.g., Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are 'legitimate reasons for firing an employee.'"); Dimino v. HSBC Bank, USA N.A., No. 11 CIV. 4189 HB, 2012 WL 2298509, at *2 (S.D.N.Y. June 18, 2012) (holding "insubordinate and disruptive behavior" to be a legitimate reason for termination).

Eagle provided evidence (which Gonzales disputes, see Part IV.C.3., infra) showing that, after Fernandes instructed Gonzales to leave work for the day and obtain

prescription glasses because of the crookedly cut plywood, Gonzales brought his stepdaughter to speak with Gonzales's supervisors and the president of Eagle and that his stepdaughter "became aggressive and unreasonable" and "yell[ed] negative comments" about Eagle's president.  See Def.'s Mem. Supp., Ex. C (Doc. No. 64-3) ("Rodriguez Decl.") ¶¶ 62, 65.  Eagle further provided testimony that this disturbance was the reason for Gonzales's termination.  See id. ¶ 66.  Having been summoned by Gonzales to Eagle's premises, the stepdaughter's behavior is attributable to Gonzales and thus a legitimate reason for his termination.

        3.      Pretext

Once the employer asserts a legitimate, non-discriminatory reason for terminating a plaintiff, the presumption of discrimination disappears, and the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that" the reason for the adverse employment action "was motivated, at least in part, by discrimination." Tori v. Marist Coll., 344 F. App'x 697, 699 (2d Cir. 2009) (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007)).  In some instances, the factfinder may infer intentional discrimination from the falsity of the employer's explanation.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000); see also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases.").

Gonzales has presented sufficient evidence for a reasonable jury to conclude that Eagle's asserted reasons for terminating him are pretextual.  With regard to Eagle's

14

assertion that it terminated Gonzales because of his inability to cut plywood correctly, Gonzales testified that his work was good and that Fernandes had approved of similar work quality in the past. See Gonzales Dep. I at 137. Further, Eagle's explanation of why it terminated Fernandes has been somewhat inconsistent. Compare Def.'s Mem. Supp. 22 ("The record shows that the plaintiff was terminated because he did not satisfactorily perform his job." (emphasis added)) with Def.'s Reply 8 ("The defendant has always proffered the same non-discriminatory bases for its termination of the plaintiff; namely, his workplace disturbances of September 19, 2011."). With regard to the disturbance in Louis Eagle's office, while Gonzales's testimony is not entirely clear on the point, Gonzales appears to testify that he had been fired even before his stepdaughter entered Eagle's premises. See Gonzales Dep. I at 151–52. Obviously, the incident with Pedras cannot have caused Gonzales's termination if the termination occurred before Pedras arrived. Further, the record contains evidence that Gonzales's stepdaughter initially came to the premises to act as a translator and that she was calm before Eagle's president called her a bastard. See id. at 154. A reasonable jury could infer from this that Eagle's president effectively caused the workplace disruption by insulting Gonzales's stepdaughter.[6] For an employer to terminate an employee on the basis of a disruption that it (the employer) caused would be pretextual.[7]

---

[6] While Gonzales's knowledge of the contents of the conversation between Pedras and Louis Eagle is based on what Pedras told him, Gonzales could testify that he heard the word "bastard" and that Pedras did not raise her voice before that point. See Gonzales Dep. I at 153–54.

[7] In an effort to cast doubt on Eagle's asserted reason for the termination, Gonzales asserts that Eagle originally reported to the Connecticut Department of Labor that it terminated Gonzales because he had missed several days of work. Pl.'s Mem. Opp'n 27. Gonzales cites no evidence to support this contention.

### D. Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotion distress ("IIED"), the plaintiff must establish:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress[;] and (4) that the emotional distress sustained by the plaintiff was severe.

Petyan v. Ellis, 200 Conn. 243, 253 (1986). Conduct is extreme and outrageous only if it "exceeds all bounds usually tolerated by decent society." Appleton v. Bd. of Educ. of Stonington, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id. at 211.

A reasonable jury could find that Fernandes intentionally inflicted Gonzales with emotional distress. The record contains evidence of Fernandes cursing at employees and throwing items in anger. See Gonzales Dep. I at 123; Molina Dep. 14, 50, 61. More concerning, Molina and Gonzales testified that Fernandes disposed of laborers' food, see Gonzales Dep. I, at 15; Molina Dep. 14, despite the fact that these employees sometimes had to work long hours in difficult conditions, see Gonzales Dep. I at 37, 92, 123; Molina Dep. 19. While much of this conduct, in isolation, would not be sufficient to establish an IIED claim, taken together and viewed in the light most favorable to Gonzales, a reasonable jury could find that Gonzales has established such a claim.

## V.  CONCLUSION

For the foregoing reasons, the court **DENIES** in part and **GRANTS** in part Eagle's Motion for Summary Judgment (Doc. No. 63).  The court grants summary judgment as to Gonzales's disparate treatment claim under Title VII, and it denies summary judgment as to Gonzales's hostile work environment, retaliation, and IIED claims.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 14th day of August, 2015.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge
